UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

SANDRA KELLOGG MORNEAU          CIVIL ACTION NO. 11-cv-1805

VERSUS                          JUDGE STAGG

MARK D. SIMS, ET AL             MAGISTRATE JUDGE HORNSBY

REPORT AND RECOMMENDATION

**Introduction**

Jean (John) Morneau was a local attorney who lived in north Caddo Parish just south of the Arkansas state line. He became involved in a dispute with members of a hunting club that leased land in Arkansas adjacent to Morneau's Louisiana property. An Arkansas court, at the request of club members, issued a misdemeanor arrest warrant for Morneau based on his alleged actions on hunting club property. When Arkansas law enforcement authorities attempted to serve the warrant on Morneau in the woods north of his home, it resulted in an Arkansas deputy sheriff shooting the 71-year-old Morneau twice with a rifle. Morneau died within minutes.

Sandra Kellogg Morneau ("Plaintiff") filed this civil action, in her capacity as succession representative for Morneau and in her individual capacity, against several defendants who were involved in the events surrounding her husband's death. Those defendants include three officers of the Arkansas Game & Fish Commission, the Miller County sheriff and two of his deputies, and two Louisiana citizens who are members of the

hunting club. Plaintiff originally named Louisiana Wildlife Agent Jay Thomas as a defendant, but she later dismissed all claims against Thomas.

Before the court are two motions to dismiss. The first motion (Doc. 12) was filed by the Arkansas wildlife officers. It challenges the exercise of personal jurisdiction over two of them and argues that the complaint should be dismissed for improper venue. The second motion (Doc. 17) was filed by the Miller County sheriff and his two deputies. It challenges this court's exercise of personal jurisdiction over those three defendants and argues that the complaint should be dismissed or transferred because this is an improper venue. For the reasons that follow, it is recommended that the motions be granted by transferring venue of this action to the Western District of Arkansas, in which Miller County is located.

**Relevant Facts**

Mark Sims and James Wolfe, citizens of Louisiana, were members of the Shang-Ri-La Hunting Club. The club leased or used property near Ida, Louisiana, which is in north Caddo Parish near the state line with Arkansas. Plaintiff alleges that the club used property in both Arkansas and Louisiana in an area where there is a disputed and indeterminate border between the two states. Complaint, ¶ 17. Members of the club had a running dispute with Morneau over the boundary and the extent of the parties' rights regarding various wooded tracts and shooting lanes. The dispute included the use of gates to block access, posting and destruction of posted signs, constructing and destruction of deer stands, and the making of noise or firing weapons in the vicinity of others. ¶ 18. Morneau sought assistance from state

and federal government officials to resolve the location of the border "to avoid a violent confrontation as he presciently foretold." ¶ 19

Members of the hunting club also complained to officials. Police reports show that Sims contacted an officer of the Arkansas Game & Fish Commission in October 2009 to complain that Morneau had been trespassing on the club's deer lease. He reported that Morneau, who lived within a couple hundred yards of the state line, had positioned a deer blind directly on the border looking due north so that the person using it would fire into Arkansas. Sims said that several club members confronted Morneau the previous year. Morneau, who was wearing two pistols (for which he was well known), allegedly told them he would hunt where he pleased and he did not need a license. Sims reported that he built a platform stand in the area for the current hunting season, but someone pushed it over and shot it full of large bullet holes.

Based on Sims' complaint, the Arkansas wildlife agent joined a Louisiana agent and went to Morneau's home to speak to him. Morneau was wearing his twin pistols. According to the agent's report, Morneau denied doing any damage on the lease or making any statements to club members. The Arkansas agent wrote that he gave Morneau a printed map that showed the location of the state line.

Sims reported in January 2010 that the club members continued to have problems with Morneau, who was destroying stands and firing a gun into the woods when the members were in the area. An Arkansas Game & Fish officer, accompanied by a Louisiana agent,

visited Morneau. The agent wrote in his report that Morneau told the agents that he believed there was a "magnetic anomaly" in the area that made the lines drawn by surveyors incorrect.

Sims again contacted an Arkansas Game & Fish officer on the evening of October 2, 2010. He reported that he had placed on his deer lease a camouflage wooden blind worth several hundred dollars. He said he soon saw Morneau use an ATV to drag the blind south towards Morneau's home. Sims had reported a few days earlier that Morneau cut several large trees on timber company property and painted a line and put posted signs on land the club believed it controlled.

Sims completed an affidavit and warrant application in the Miller County state court. It was submitted in the name of Sims and Wolfe, but only Sims signed the sworn application. The Miller County court then issued a warrant dated October 8, 2010 to arrest Morneau for first-degree assault, harassment, and two charges of second-degree criminal mischief. Plaintiff alleges that the misdemeanor warrants were obtained as part of a conspiracy with Wildlife Agent Jackie Runion "under false pretenses and baseless representations." Complaint, ¶ 22. The Arkansas court also issued an ex parte "no contact order" that directed Morneau to remain at least 100 yards from the hunting club or its members, including Sims and Wolfe. (The order stated incorrectly that Morneau had appeared in court before the order issued.)

On a Sunday afternoon, two days after the warrant issued, Arkansas wildlife agents Justin Smith, Jackie Runion, and Clay Raborn joined Miller County Deputy Sheriff Robert Tibbit in Doddridge, Arkansas, and the group traveled to the deer lease to attempt to arrest

Morneau on the Miller County warrant.  The officers had been told that Morneau was likely to come on the lease and destroy property on a Sunday afternoon.  They state in their reports that they planned to wait for Morneau to cross into Arkansas, witness any destruction of property, and then identify themselves and arrest Morneau on the warrant.  The officers stated in the reports that they knew Morneau would be armed with at least two pistols, so they planned to take extra precautions.

Plaintiff alleges that the four officers, as well as Sims and other "unknown conspirators," traveled on Louisiana roads to reach the hunting club area. They allegedly entered an access gate on Ida Boy Scout Road and traveled it and a gravel road, both in Louisiana, along the way. Complaint, ¶ 28.  This travel through  Louisiana is offered by Plaintiff as supportive of the exercise of personal jurisdiction and venue.

A map suggests that there are not any significant roads on the Arkansas side of the border that would permit access to the hunting club area.  The map further shows that if one drove south from Arkansas on U.S. Highway 71 and crossed into Louisiana, he would reach the Ida Boy Scout Road within about 300 or 400 yards of the border.  There, he would turn west on the road and travel for a short distance before the road turns north and goes across the border into Arkansas.

Plaintiff alleges that the officers brought with them a cardboard box painted with camouflage colors and bearing two yellow posted signs, which they placed at a point within sight of a tree where Morneau had posted a no trespassing sign.  Someone allegedly telephoned Morneau to report the blind, which was used as a lure. ¶ 29.  Plaintiff alleges that

the officers were heavily armed, including at least three 5.56 mm semi-automatic rifles, and Sims and other unnamed conspirators were nearby on ATVs and armed with AK-47 rifles. ¶ 30. The unnamed conspirators allegedly revved up their ATVs to lure Morneau into a "sniper gauntlet" on a Sunday afternoon when they knew, based on their "patterning" of him, that he would be walking in the woods. ¶ 31. Morneau, "who was widely-known as an advocate of 'open carry', or the open exercise of his Second Amendment rights," was apparently considered dangerous enough to justify a felony-type arrest on the misdemeanor charges. A confrontation occurred during that arrest, which resulted in Morneau's death. There are no known independent witnesses to the events. ¶ 32.

Written reports prepared by the officers involved state that they were hidden in the woods on the Arkansas side of the line when they saw Morneau walking north toward the state line at about 4:00 p.m. When Morneau reached the border, he tore a posted sign off a post lying on the ground, threw the sign on the ground, and turned and headed back south toward his residence. He walked a few yards, then turned around and headed back north. The four officers were hiding in the brush in various places. Smith wrote that he lost sight of Morneau at this time, but he could hear him kicking a cardboard blind that was down the trail.

The reports state that when Morneau was about 200 feet north of what the officers believed was the state line, Deputy Tibbit stepped out into the open and yelled, "Police! Let me see your hands!" Wildlife Officers Raborn and Smith stepped out of the woods south of Tibbit and began to yell, "Wildlife officer! Show us your hands!" Smith wrote in his report

that as he and Raborn headed toward Tibbit and Morneau, he saw Morneau turn toward the officers, square up and begin to draw a pistol with his right hand, with his left hand on the other pistol. Tibbit yelled, "Drop the gun! Drop the gun!" as Morneau continued to raise the pistol in his right hand and began to draw the other pistol from the left holster. Officer Raborn gave a similar account of the events and said he started to fire at this point but heard two shots and saw Morneau fall. Tibbit wrote that he first thought Morneau was going to throw aside the pistol, but Morneau kept coming up with it. Tibbit said he had little time to react and fired once, after which Morneau was still standing with the gun in his hand. Tibbit fired again, and Morneau fell.

Officer Smith wrote that he secured the revolver lying next to Morneau's left hand, then moved Morneau slightly and saw the other revolver lying under Morneau's leg next to his right hand. That revolver was cocked. Smith said that he asked Morneau if he had any other weapons, and Morneau said he had one in his right pocket. Smith removed a small caliber semi-automatic pistol in a holster that allowed the pistol to be fired without removing it from the holster. He also reported removing two knives from Morneau's left pocket.

Officer Raborn wrote that he was holding Morneau's hands, but Morneau said he could not breath, so Raborn let his hands go. Raborn wrote that Morneau then reached toward a knife in his shirt pocket, which required Raborn to again grab Morneau's hands and then secure the knife. Smith wrote that Morneau stopped breathing at about 4:20 p.m.

Plaintiff alleges that "conspirators and unnamed deputies" of the Miller County sheriff's office failed to seek the most immediately available first responders from nearby

Ida, Louisiana, instead requesting a helicopter and ground units from Texarkana. Plaintiff alleges that this delay "may have deprived [Morneau] of the opportunity to survive." She also alleges that "fragmenting rounds" substantially increased the trauma, although their use has been denied. ¶ 33. An autopsy allegedly described five holes in Morneau, with four of them paired as entry-exit wounds. One pair was back to front, angled upwards. ¶ 39.

Plaintiff alleges that defendant Miller County Chief Deputy Duke Schofield misled her about the condition of her husband, as did unnamed conspirators who blocked access to the wooded area owned by the Morneaus. "Unnamed members of the Miller County Sheriff's Office" allegedly took up positions on Morneau's land to establish a perimeter inside Louisiana, which restricted Plaintiff's ability to be with her husband in his final minutes or allow a priest to attend to religious rites. ¶ 43.

**Venue**

The basic civil venue statute, 28 U.S.C. § 1391, was amended effective in cases commenced after January 6, 2012. It now sets forth a general venue provision in Section 1391(b). Prior to the amendment, it had separate venue rules for diversity and federal question cases. Subsection (a) governed venue in a case where jurisdiction was founded only on diversity of citizenship, and Subsection (b) governed venue where jurisdiction was not founded solely on diversity.

This case was filed before the amendment, and Plaintiff alleges federal claims, so the former version of Subsection (b) will apply. It provided:

> "(b) A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought."

The first provision does not apply because not all defendants reside in the same state. Sims and Wolfe reside in Louisiana, and some or all of the other defendants reside in Arkansas. The third prong applies only when there is no district in which the action may be brought, so the parties have correctly focused on Subsection (b)(2), which permits venue in a district in which "a substantial part of the events or omissions giving rise to the claim occurred." The relevant statutory language liberalized the former "in which the claim arose" formulation, and it is now clear that there can be more than one district in which a substantial part of the events giving rise to the claim occurred. Clarendon America Ins. v. Coastal Cargo Co., Inc., 2007 WL 3256616 (W.D. La. 2007), citing 14 D Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 3d § 3806.1, p. 200 (2007 ed.). The chosen venue does not have to be the place where a majority of the events took place or where the most relevant events took place, but the selected district's contacts must be substantial. See McClintock v. School Board East Feliciana Parish, 299 Fed. Apex. 363, 365 (5th Cir. 2008); Schwarz v. National Van Lines, Inc., 317 F.Supp.2d 829, 834 (N.D. Ill. 2004).

There was originally some dispute as to whether the point where Morneau was shot was located in Arkansas or Louisiana. The parties conducted discovery, including deposing

a land surveyor. Plaintiff has now stipulated (Doc. 28) that both the point at which Deputy Tibbit stepped from cover and the point at which Morneau's body was located were "north of the disputed border area, and therefore within Arkansas by any measure." Plaintiff also stipulates that Sheriff Stovall did not enter Louisiana in connection with the execution of the warrants or participate in limiting Plaintiff's access to the scene. The evidence showed that there is some uncertainty about the precise location of the border between the two states in that area. There are two competing lines, located about 100 feet apart, but Morneau's body was found more than 200 feet north of even the northernmost possible border.

Virtually all of the significant events giving rise to the claims in the complaint happened in Arkansas. The arrest warrant that Plaintiff alleges violated Morneau's Fourth Amendment and other constitutional rights issued from an Arkansas court. The Arkansas law enforcement officers gathered in Arkansas, traveled to the hunting lease located in Arkansas, attempted to arrest Morneau in Arkansas, and shot Morneau in Arkansas. The agents traveled a short distance through Louisiana on their way to the site, but nothing about that brief travel on a Louisiana road could be described as a substantial part of the events giving rise to any claim. The travel to the site might have been necessary, but it was no more substantial in giving rise to the claim than where the defendants' vehicle was purchased. That Plaintiff, living in Louisiana, may have suffered the harms of Morneau's passing is not sufficient to permit venue. See McEvily v. Granai, 2001 WL 1098005 (S.D. NY 2001) (shooting of New Yorker in Georgia did not permit venue in New York merely because family members felt the effects of the victim's death in New York). Plaintiff takes a different

position but cites no authority in which venue was found to be proper under similar circumstances.

Plaintiff points to her allegations that one or more defendants erected some form of barricade in Louisiana that prevented Plaintiff or a priest from reaching Morneau in his final minutes. The available evidence does not indicate that there was any such attempt by Plaintiff or a priest, or even time for such an opportunity. Caddo Deputy Michael W. Gray testified in his deposition that he insisted the Miller County officials promptly inform Plaintiff of what happened. When they did, an hour or more after the shooting, they "explained to her that he was deceased." The legal viability of such a claim is also questionable. In the end, however, what matters for venue purposes is that these alleged facts are not a substantial part of the events giving rise to the complaint. All substantial events occurred in Arkansas. For these reasons, venue is not appropriate under Section 1391(b)(2).

Venue is allowed under Section 1391(b)(3) if there is no district in which an action may otherwise be brought as provided in the statute, but there is a district where the case may have been brought. The Western District of Arkansas is a proper venue because, without doubt, a substantial part of the events giving rise to the claim occurred there.

**Personal Jurisdiction**

Even if there were venue, there is no basis for this court to exercise personal jurisdiction over the five Arkansas residents who have raised a jurisdiction challenge in their motion. Those challenges placed on Plaintiff the burden of establishing personal jurisdiction

over the non-residents. Clemens v. McNamee, 615 F.3d 374, 378 (5th Cir. 2010). The issue is presented here on pretrial motions with no evidentiary hearing, so the uncontroverted allegations in Plaintiff's complaint must be taken as true, and any conflicts between facts contained in the parties' affidavits must be resolved in the plaintiff's favor. Id. Those facts must create for Plaintiff a prima facie showing of jurisdiction. Travelers Indemnity Co. v. Calvert Fire Ins. Co., 798 F.2d 826, 831 (5th Cir. 1986).

The sheriff and his two deputies offer affidavits in which they deny any contacts with Louisiana other than things like visiting the state once or twice a year for a shopping trip or dinner. Wildlife Agents Runion and Smith testify in affidavits that they have no significant contacts with Louisiana. They and Agent Raborn squarely deny the allegations in the complaint that they routinely conducted joint operations in the area with Louisiana wildlife agent Jay Thomas, conducted surveillance of Morneau prior to the day of the shooting, and returned to Ida after that day. Plaintiff offers no competing affidavits or evidence. The only uncontroverted allegations of contact with Louisiana regard some of the agents driving down Boy Scout Road. Deputy Schofield admits that he parked at the Morneau property when he arrived after the shooting, but he denies any contact with Plaintiff.

Plaintiff attempts to base personal jurisdiction on her allegation that defendants erected a barrier or formed a perimeter within Louisiana that blocked access to the crime scene. As noted above, it is doubtful a viable claim arises from this. Caddo Deputy Michael W. Gray testified in his deposition that the only easy access to the scene was by accessing Redbud Lane in Louisiana, where the Morneaus lived. He arrived to determine if the Caddo

Sheriff had a stake in the matter, but he soon determined that the scene was in Arkansas. He did offer to have Caddo officers control access to Redbud Lane and otherwise assist on their side of the line.

Gray said that he saw a Miller County sergeant near the trailhead, and an Arkansas Wildlife and Fisheries vehicle was pulled down the trail about as far as it could go. An Arkansas wildlife agent, who he did not identify, was in the trail, probably south of the state line, and controlling access to the scene. Gray said he saw EMTs and other authorities that had been allowed access to the scene. He did not see Plaintiff or a priest attempt to access the area where her husband fell. Gray testified that Plaintiff "fell out" upon hearing the news and was soon taken inside her home.

These facts indicate some activity in Louisiana by unidentified Arkansas officers. But they are not sufficiently specific to point to any particular defendant doing anything in Louisiana that would give rise to a claim and permit the exercise of specific jurisdiction over him. Even if Plaintiff could present facts that link a named defendant or two to the perimeter allegations, the court would still lack jurisdiction over the other Arkansas residents. Sheriff Stovall, for example, offers uncontested testimony that, other than serving as sheriff of Miller County, he had no involvement in the events at issue and never entered Louisiana in connection with them. Plaintiff has not satisfied his burden of showing that this court may lawfully exercise personal jurisdiction over all five of the Arkansas defendants who have raised the challenge.

**Dismiss or Transfer**

"The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). Also, a court which lacks personal jurisdiction over a defendant may transfer the case to a district where venue is proper and where personal jurisdiction can be had over the defendant. The transfer may be accomplished under 28 U.S.C. § 1404(a), which authorizes a transfer for "the convenience of parties and witnesses [and] in the interests of justice", or pursuant to Section 1406(a), which authorizes transfer where the case has been filed in an improper venue. Bentz v. Recile, 778 F.2d 1026 (5th Cir.1985); Self v. M & M Chemical Co., 1999 WL 195576, *4 (5th Cir.1999).

Transfer is ordinarily preferable to dismissal. If the court were to dismiss this complaint, it is likely that Plaintiff would face a timeliness defense to any new complaint based on the October 2010 events. To transfer a case, the transferor court must find that the intended transferee court would be a proper venue and could exercise personal jurisdiction over the defendants. Gibson v. Wells Fargo & Co., 563 F. Supp. 2d 149, 153 (D.C. 2008).

There is no question the Western District of Arkansas is a court of proper venue for this complaint and may exercise personal jurisdiction over the six Arkansas law enforcement defendants. Two defendants, Sims and Wolfe, are Louisiana citizens, but they are alleged to have been involved in an ongoing dispute in Arkansas that led to Sims applying, on behalf of himself and Wolfe, to an Arkansas court for the issuance of an allegedly unconstitutional arrest warrant. Wolfe writes in a statement that "we" could not work out the issues with

Morneau, so they contacted Runion for help. Runion took control, and this "took us" to the Miller County DA's office to file the complaints that lead to the warrant. So even though Wolfe did not sign the application in the record, his statement indicates his personal involvement. These allegations are sufficient to present a prima facie case that an Arkansas court could exercise specific personal jurisdiction over Sims and Wolfe with respect to the claims in the complaint.

Accordingly,

**IT IS RECOMMENDED** that the Motions to Dismiss (Docs. 12 and 17) be granted by transferring venue of this action to the Western District of Arkansas, where it likely should be assigned to the Texarkana Division based on the events at issue occurring in Miller County.

**Objections**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within seven (7) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

Case 5:11-cv-01805-TS-MLH   Document 56   Filed 08/06/12   Page 16 of 16 PageID #: 646

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 6th day of August, 2012.

_____
MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE